## APPEAL OF ERNEST WOODRUFF.[1]

Docket Nos. 2050, 2260–2267, 2501, 2572.        Decided September 18, 1926.

> 1. *Held*, that the transaction involved herein between the Trust Company of Georgia and certain stockholders of that company constituted a joint venture.
>
> 2. The amount of gain realized by the stockholders of the Trust Company of Georgia who participated in the joint venture, determined.

*Harold Hirsch, Esq., Robert N. Miller, Esq., John E. McClure, Esq.,* and *J. Robert Sherrod, Esq.,* for the petitioners.
*M. N. Fisher, Esq.,* for the Commissioner.

These appeals are from determinations of deficiencies in income and profits taxes for the year 1919, as follows:

| | | | |
|---|---|---|---|
| Ernest Woodruff | $51,756.71 | Rufus C. Darby | $94.50 |
| W. S. Byck | 755.59 | David Woodward | 1,135.62 |
| W. C. Wardlaw | 749.10 | W. E. Chapin | 668.05 |
| Thomas K. Glenn | 496.49 | Edward H. Inman | 978.37 |
| J. W. Conway | 279.38 | Frank Hawkins | 407.70 |
| Fuller E. Callaway | 115.50 | | |

They involve the same facts and present the same questions, to wit, whether or not the taxpayers realized taxable income as a result of the transaction hereinafter set forth in the findings of fact. The appeals were consolidated for hearing and decision.

### FINDINGS OF FACT.

The taxpayers herein were, during the year 1919, stockholders in the Trust Company of Georgia, a banking corporation having its principal office and place of business at Atlanta, Ga. The capital, surplus and undivided profits of the corporation were $2,571,053.30 on August 1, 1919, and $2,562,288.04 on September 1, 1919. Its capital stock issued and outstanding during the year 1919 consisted of 10,000 shares, of which 683 shares were owned by Ernest Woodruff, 100 shares by W. S. Byck, 78 shares by W. C. Wardlaw, 100 shares by Thomas K. Glenn, 25 shares by J. W. Conway, 10 shares by F. E. Callaway, 10 shares by Rufus C. Darby, 200 shares by David Woodward, 125 shares by W. E. Chapin, 102 shares by E. H. Inman, and 35 shares by Frank Hawkins.

---

[1] The following were heard with the above and are decided herewith: Appeals of W. S. Byck, No. 2260; W. C. Wardlaw, No. 2261; Thomas K. Glenn, No. 2262; J. W. Conway, No. 2263; Fuller E. Callaway, No. 2264; Rufus C. Darby, No. 2265; David Woodward, No. 2266; W. E. Chapin, No. 2267; Edward H. Inman, No. 2501; and Frank Hawkins, No. 2572.

There was in existence during the times herein mentioned a Georgia corporation known as the Coca-Cola Co., with a capital stock of 500 shares of the par value of $100 each, which stock was, in the year 1918, placed in trust by the stockholders with the Central Bank and Trust Corporation, and against which beneficial ownership certificates in the amount of $25,000,000 were issued by such trustee. These beneficial ownership certificates were owned and held by divers persons.

During the month of July, 1919, four parties, the Newmont Company, the Shermer Investing Corporation, Charles H. Sabin, and the Trust Company of Georgia, agreed orally that they would form a syndicate composed of the four parties, hereinafter known as the Bankers Syndicate, and that the Trust Company of Georgia, acting for the syndicate, would cause to be organized a corporation under the laws of Delaware, or such other State as might be deemed advisable, for the purpose of acquiring all of the assets of the Georgia corporation known as the Coca-Cola Co. The new corporation was to issue preferred stock in the amount of $10,000,000 and 500,000 shares of no par value common stock. The Bankers Syndicate was to acquire 83,000 shares of such common stock at $5 per share and the remaining shares were to be purchased from the new corporation at $35 per share. The interest in and responsibilities of the syndicate were to be divided as follows: the Newmont Co., 10 per cent; the Shermer Investing Corporation, 30 per cent; Charles H. Sabin, 30 per cent; and the Trust Company of Georgia, 30 per cent.

As part of the plan to carry out the enterprise referred to, the Trust Company of Georgia, on behalf of the Bankers Syndicate, obtained on or about August 1, 1919, in the name of Robert C. Alston, an option to purchase all of the beneficial ownership certificates in the Coca-Cola Co. The option carried no obligation unless exercised, but if exercised required payment to the owners of the beneficial ownership certificates, within 30 days therefrom, of $15,000,000 in cash and the $10,000,000 of preferred stock of the corporation to be organized. The option was to expire August 29, 1919.

The board of directors of the Trust Company of Georgia were of the opinion that the financial status of that company did not justify its entering into so large an obligation as 30 per cent of the liability under the option to purchase the beneficial ownership certificates in the Coca-Cola Co. and they therefore declined to let the Trust Company assume that liability, but by resolution adopted on August 2, 1919, they authorized the Trust Company to participate in the purchase of the beneficial ownership certificates, provided that one-half of the amount for which the Trust Company would be called upon to

obligate itself in connection therewith would be underwritten by solvent persons, firms or corporations. The material portion of said resolution adopted by the board of directors of the Trust Company of Georgia on August 2, 1919, is as follows:

BE IT RESOLVED, that this Company do enter into the purchase of said participation certificates or of the assets of the Coca-Cola Company through a Syndicate or Syndicates, provided the unanimous opinion of Attorneys representing this Company, the Guaranty Trust Company, the Chase Securities Company, and the Coca Cola Company is favorable; and further provided that *one-half of the amount for which this Company will be called upon to obligate itself in this behalf be underwritten by solvent persons, firms or corporations.*

On August 2, 1919, or shortly thereafter, a number of the larger stockholders of the Trust Company of Georgia agreed orally that they would participate in underwriting the liability of that company under the option to purchase the beneficial ownership certificates of the Coca-Cola Co.

On August 8, 1919, Robert C. Alston assigned to the Trust Company of Georgia the option obtained by him to purchase the beneficial ownership certificates in the Coca-Cola Co.

On August 13, 1919, the board of directors of the Trust Company of Georgia adopted the following resolution:

BE IT RESOLVED, That this Company do enter into a Syndicate for the purchase of the participation certificates representing the shares of The Coca-Cola Company, a corporation organized under the laws of the State of Georgia, upon the terms expressed in the outstanding options executed by the holders of said certificates, to Robert C. Alston, to the extent of four million, five hundred thousand ($4,500,000) dollars, and the President of this Company, or either of the Vice-Presidents, is authorized to obligate this Company in said purchase to this extent, and to do all things necessary to be done to give full force and effect to this resolution.

ALSO:

WHEREAS, the Directors have authorized this Company to obligate itself to the extent of not exceeding four million five hundred thousand ($4,500,000) dollars, in participation in the Distributing Syndicate, which is to purchase the shares of stock of The Coca-Cola Company, the Delaware Corporation, which is to be formed for the purpose of taking over the properties of The Coca-Cola Company, the Georgia Corporation, and

WHEREAS, it is desirable that this Company shall share the burden of financing said proposition with others,

BE IT THEREFORE RESOLVED, That the Executive Committee is authorized to propose to each of the Stockholders of this Company that if he will deposit with this Company in cash, one hundred and ninety-five ($195) dollars for each share of stock owned by him in this Company, to be used in assisting this Company in financing said transaction, this Company will divide with him the stock of The Coca-Cola Company, the Deleware Corporation, retained by it under the original Bankers' Syndicate in proportion to his holdings, not to exceed one share of stock in The Coca-Cola Company, for each share of stock held by the stockholders in this Company on the same basis at which this Com-

pany acquired said stock, returning to said Stockholder, upon the termination of said Syndicate, the amount of money deposited by him, less the cost of the stock on the basis that this Company acquired same.

BE IT FURTHER RESOLVED, That upon the assumption by him of a proportionate part of the liability of this Company in committing itself to a participation in the Syndicate hereinbefore referred to, an interest in said Syndicate to the extent of twenty thousand (20,000) shares of the stock of The Coca-Cola Company, the Delaware Corporation, be transferred to Ernest Woodruff, in consideration of the time and services given by him in connection with this transaction.

BE IT FURTHER RESOLVED, That the Executive Committee of the Company is hereby authorized to dispose of all other shares of stock in The Coca-Cola Company, the Delaware Corporation, which this Company may be entitled to receive by virture of its participation in such Distributing Syndicate at such prices, in such manner, and upon such terms as in its judgment may seem proper to serve the best interests of this Company, and to comply with its obligations to the Syndicate in connection therewith.

RESOLVED, That the selling Syndicate to be organized in connection wth the underwriting mentioned above, be sponsored by the Trust Company of Georgia, and that securities of the Company being formed to take over the various properties of The Coca-Cola Company, of Atlanta, shall be offered to the public over the name of the Trust Company of Georgia.

The option to purchase the beneficial ownership certificates in the Coca-Cola Co., obtained by Robert C. Alston and assigned by him to the Trust Company of Georgia, was exercised by the Trust Company of Georgia on August 21, 1919. On the same day the Trust Company of Georgia, the Newmont Company, Charles H. Sabin and the Shermer Investing Corporation formally executed a syndicate agreement as follows:

NEW YORK, *August 21, 1919.*

The NEWMONT COMPANY,
The SHERMER INVESTING CORP.,
Mr. CHARLES H. SABIN.

DEAR SIRS: We have accepted a transfer of options covering all of the participation certificates representing all of the outstanding shares of the capital stock of said The Coca-Cola Company of Georgia, which options we are to hold and exercise for the benefit of ourselves and others, in the following proportions:

|  |  |
|---|---|
| The Newmont Company, a New York Corporation | 10% |
| The Shermer Investing Corporation | 30% |
| Charles H. Sabin | 30% |
| Ourselves | 30% |

All responsibilities incurred by us in connection with the exercise of the said options and carrying out the intent and purposes thereof and of the matters herein referred to shall be for account of ourselves and yourselves in the proportions above stated.

For such account, in the proportions stated, we are to cause a corporation to be organized under the laws of Delaware or such other state as may be deemed advisable, and to vest in it in the name, good will and other property, rights and interests now owned and held by the said The Coca-Cola Com-

pany of Georgia, which corporation is to issue $10,000,000 par value preferred stock with the rights and in accordance with the terms and provisions of said options, and 500,000 shares of common stock without par value. For ourselves and yourselves, in the proportions stated or their nominee or assigns, we are to acquire 83,000 of said non-par value shares of common stock at $5. per share.

We are undertaking to organize a syndicate which is to purchase from the new company the remaining 417,000 shares of said common stock at $35. per share.

All of the common stock of the new company so acquired shall be deposited with the Guaranty Trust Company of New York as Agent for Ernest Woodruff, S. C. Dobbs and E. W. Stetson, as voting Trustees under a Voting Trust Agreement, which shall continue for not less than five years. In the event of the death, incapacity or refusal to act of any of the Voting Trustees, the successor to Mr. Dobbs shall be designated by Mr. Albert H. Wiggin or by his personal representatives, and the successor to Mr. Stetson shall be designated by Mr. Charles H. Sabin or by his personal representatives.

If the foregoing is in accordance with your understanding please so signify by signing the acceptance thereof subjoined hereto for the purpose and returning the same to us. By so doing, it is understood that you will become responsible to us for your proportion of all obligations and responsibilities to be assumed by us as transferees of said options and in carrying out the terms and conditions of this letter in the proportions hereinabove stated.

If deemed advisable in carrying out the purposes of this agreement, by mutual consent, the options hereinabove may be assigned to the new Company.

Very truly yours,

TRUST COMPANY OF GEORGIA.
By W. C. Wardlaw
Vice-President.

The foregoing accords with our understanding and is hereby accepted.

NEWMONT COMPANY
By THEODORE SCHUYLER, Pt.,
SHERMER INVESTING CORPORATION
By W. T. WILES, Treasurer,
CHARLES H. SABIN
By HAROLD STANLEY.

Immediately after the exercise of the option and prior to August 26, 1919, the Trust Company of Georgia sent circular letters to about six hundred bankers and stockbrokers throughout the United States and Canada, inviting them to become members of a selling syndicate which was to be organized by the Trust Company of Georgia, and to participate in the purchase of 417,000 shares of the common stock of the new corporation to be formed, at $35 per share. The part of the circular letter pertinent here is as follows:

It is proposed to organize under the laws of the State of Delaware, or of such other State as may be selected, a corporation, (hereinafter called the New Corporation), for the purposes of acquiring, subject to current liabilities other than Federal taxes accrued to date of transfer, all of the assets, business and good will, except a possible rebate on account of Federal taxes for 1918,

of the present The Coca-Cola Company, which is a Georgia corporation. The name of the New Corporation is, if possible, to be the same or similar to that of the Georgia corporation and it is proposed that the New Corporation shall issue $10,000,000 of 7% Cumulative Preferred Stock having a par value of $100. per share, and 500,000 shares of Common Stock without par value. The Preferred stock is to be acquired by the stockholders of the present The Coca-Cola Company of Georgia, is to be non-voting unless default be made in the payment of dividends for six months, and any or all thereof may be retired at any time at par and accrued dividends upon ninety days' notice. All of the Common stock is to be deposited under a Voting Trust Agreement which is to continue for not less than five years.

We are organizing a Syndicate, of which we are to act as Syndicate Manager and in which we shall have the right to participate, to purchase from the New Corporation, when, as and if issued and accepted by us, subject to the approval of our counsel, at $35. per share, all or any part of voting trust certificates representing 417,000 shares of the Common stock of the New Corporation, in which Syndicate we have reserved for you a participation of ——— shares.

Syndicate participants shall not transfer or otherwise dispose of all or any part of their participation without the consent in writing of the Syndicate Manager.

The Manager will duly notify participants if and when subscription books for the voting trust certificates are to be opened, whereupon, but not before, participants may then take subscriptions for certificates, subject to allotment, on a " when, as and if issued and received by us, subject to approval of counsel", basis, at $40. per share, and will be entitled to a commission of $1. per share on confirmed allotments, from which commission participants may allow 50 cents per share to dealers and financial institutions. No further concessions or commissions shall be allowed. All subscriptions are to be received for Syndicate account and should be reported to the Manager by wire. To avoid duplication, when orders are sent by telegram and confirmed by mail, the letter of confirmation should definitely refer to the telegram and state that it is in confirmation thereof.

No replies to any of these circular letters were received prior to August 26, 1919.

On August 22, 1919, the Trust Company of Georgia sent to the taxpayers and to all other stockholders of the company a letter reading—

STRICTLY CONFIDENTIAL.

DEAR SIR: As you are probably aware, we,. associated with strong New York interests, will share in the profits to be derived from the acquirement of the Coca–Cola Co. assets and business. This is a large transaction, involving a large sum of money, and we have made a large commitment in connection with the financing of the enterprise.

We made this commitment expecting to offer to our stockholders the privilege of participating in the profits of the enterprise on the same basis that the Trust Co. will share in such profits, provided such stockholders will contribute to the financing of the enterprise in proportion to the number of shares which they hold in the Trust Co.

It is impossible, at this time, to explain to you the details of the transaction, since they have not yet been definitely agreed upon and are subject to change, but it will be necessary to make the financial arrangements immediately and before the details can be worked out.

You hold ——— shares of stock in the Trust Company and to enable you to participate in this transaction the amount of money it is necessary for you to place with us is ————. On the dissolution of the syndicate which we anticipate will be not later than October 1, you will be advised regarding its operation and a distribution promptly made.

We think it is to your interest to take advantage of this offer, and we recommend it to you. If we do not receive your check, however, for the amount above stated on or before 12 o'clock noon on the 27th day of August, 1919, we will assume that you do not desire to participate.

The rights you acquire hereunder, if accepted, are not transferable before the dissolution of the syndicate.

Please sign the acceptance below, on the inclosed duplicate, and return with check.

> Yours very truly,
>
> GEO. B. PENDLETON, *Treasurer.*

The owners of 9,233 shares of the capital stock of the Trust Company of Georgia accepted the offer to participate in the enterprise. To cover their share of the liability, they deposited with the Trust Company of Georgia $195 for each share of their stock in that company. The taxpayer, Ernest Woodruff, also put into the enterprise an additional amount equal to $195 on 2,000 shares. The record does not show the exact date the several stockholders of the Trust Company deposited the money to cover their share of the enterprise, but it was paid some time prior to August 26, 1919. As is shown by the acceptance letter of W. C. Bradley, one of the stockholders, dated August 23, 1919, some of the stockholders had agreed to participate in the enterprise prior to August 22, 1919. Mr. Bradley's letter of acceptance was as follows:

> EAGLE & PHOENIX MILLS,
> *Columbus, Ga., August 23, 1919.*

TRUST CO. OF GEORGIA,
        *Atlanta, Ga.*

GENTLEMEN:

Your circular letter of August 22, to Mr. W. C. Bradley, concerning the underwriting syndicate for handling the purchase of the Coca-Cola Company, has been received in the absence of Mr. Bradley on a business trip to New York.

Before leaving, Mr. Bradley went into this matter fully with me, and anticipating that a call for funds might be made prior to his return, he instructed, and fully empowered me to handle the matter for him in his absence.

You will accordingly find inclosed, as requested, the carbon copy of the above-mentioned letter from you, dated August 22, 1919, to which, by authority I have signed Mr. Bradley's name, accepting for Mr. Bradley the offer of participation made in said letter.

Also further acting for Mr. Bradley, I attach hereto check of the W. C. Bradley Co. No. 1739, dated August 23, 1919, drawn upon the National City

Bank, of New York, in favor of the Trust Co. of Georgia, for $9,750, same being the amount specified in the above-mentioned letter of August 22.

I know that it is Mr. Bradley's desire and intention to participate in this matter fully in all respects, and if there is anything else necessary to be done by him, or for his account to that end, kindly communicate promptly by telegraph, telephone, or letter.

Yours very truly,

J. D. MASSEY.

Immediately after August 21 and prior to August 26, 1919, the Trust Company of Georgia, as manager of the common stock syndicate, offered 417,000 shares in the new Coca-Cola Co. to the public on an "if, as and when issued" basis, at $40 per share, and on August 26, 1919, closed the subscription on account of such syndicate, the offer being then oversubscribed 143,000 shares. On August 29, 1919, notices of the allotment of shares were sent to the common stock syndicate subscribers by the Trust Company of Georgia, as syndicate manager, and on or before September 5, 1919, payments were received on the entire allotment of 417,000 shares. On the same date, the new corporation, called the Coca-Cola Co., was organized under the laws of the State of Delaware. On September 8, 1919, the Coca-Cola Company of Delaware, by resolution of its board of directors, authorized the sale to persons not named of 83,000 shares of its common stock, at $5 per share. On September 9, 1919, by resolution of the board of directors of the same company, 417,000 shares of its common stock were sold to the Trust Company of Georgia, as manager of the common stock syndicate, at $35 per share, payment therefor to be made on or before September 16, 1919.

The 83,000 so-called $5 shares of stock were in fact sold by the Coca-Cola Company of Delaware to the Bankers Syndicate hereinbefore mentioned, and they were divided as follows: The Newmont Co., 8,300 shares; the Shermer Investing Corporation, 24,900 shares; Charles H. Sabin, 24,900 shares; and the Trust Company of Georgia, 24,900 shares.

Of the 24,900 shares which the Trust Company of Georgia received by virtue of its 30 per cent interest in the Bankers Syndicate, 13,677 shares were retained by it and 11,223 shares were distributed among the taxpayers herein and the other stockholders of the Trust Company, who, as above set forth, participated with it in the enterprise, each of such persons receiving one share for each $195 he had put into the deal. The stock which the taxpayers and the other stockholders of the Trust Company of Georgia received was issued direct to them by the Coca-Cola Company of Delaware. The Trust Company of Georgia also, at the conclusion of the transaction,

50144—27——57

returned to the taxpayers and the other stockholders who participated in the transaction $190 for each $195 they had contributed. They were informed of the conclusion of the deal and of the results thereof by letters dated October 1, 1919, which read as follows:

TRUST COMPANY OF GEORGIA,
*Atlanta, Ga., October 1, 1919.*

Dear Sir:

Under date of August 22, 1919, we extended you an invitation to join us in the financing of the purchase of the Coca-Cola Co. of Atlanta.

You availed yourself of this invitation by placing with us $————. The deal has now been consummated and we are inclosing you treasurer's check for $———— covering the amount to be returned to you.

We are inclosing you herewith 50 shares of Coca-Cola common stock, represented by

Voting Trust Certificate No. ————
      "      "      "      "      ————

issued in your name which, as the result of your participation, we are able to sell you at $5 per share, and we have deducted $250 from the funds mentioned above to cover the purchase price of the shares.

Please sign and return to us the carbon copy accompanying this letter, also our participation receipt which was issued to you when you made this payment.

We are glad to have had you with us in this transaction. The result has been gratifying to us and we trust that it is equally so with you.

And now may we add a personal word to you as a shareholder? Our company is doing well and forging ahead steadily. It is the ambition of the officers to make the Trust Company of Georgia the greatest financial institution in the South, and with your help we can do it.

Considering our strength and the liberal interest we pay, our deposits are not large and we need your assistance in building them up. Let us have the benefit of any funds for which you have no immediate use. Open with us an inactive account. We will pay you 3 per cent thereupon. On certificates of deposit, payable on demand, we will pay the same rate, and on time certificates, running for a period of three months or longer, 4 per cent. On savings deposits we allow 4 per cent.

If you already have funds on deposit with us, be assured of our appreciation. Speak to your friends regarding us and invite them to make use of the services we offer in our various departments.

Yours very truly,

GEORGE B. PENDLETON, *Treasurer.*

The net result of the entire transaction, so far as the taxpayers and the other stockholders of the Trust Company of Georgia who participated therein are concerned, was that each of such stockholders, for each $195 he had put into the enterprise, received $190 in cash and one share of the capital stock of the Coca-Cola Company of Delaware.

The Commissioner upon audit of the taxpayers' returns for the year 1919 determined that the fair market value of the common stock of the Coca-Cola Company of Delaware received by the taxpayer

was $40 per share; that they, as a result of the transaction involved herein, had realized a profit equal to $35 on each share of such stock received by them, and that there are deficiencies in tax in the amounts hereinabove set forth.

## OPINION.

MARQUETTE: The transaction which gave rise to the income involved in this appeal is the identical transaction which was before the Board in the *Appeal of W. C. Bradley*, 1 B. T. A. 111. In that appeal we held that the receipt by Bradley, upon the completion of the financing of the Coca-Cola Company of Delaware by the Trust Company of Georgia and the other members of the Bankers Syndicate, of 50 shares of the common stock of the new company for $5 per share, constituted a taxable dividend to him to the extent of the difference between the alleged purchase price and the fair market value of such shares; which difference was found to be $1,750. However, the evidence presented in that appeal did not as fully disclose the nature of the transaction as does the evidence herein, and we are constrained to a different conclusion here.

First, we are of the opinion that whatever income the taxpayers realized from the transaction in question came to them not as a dividend from the Trust Company of Georgia, but as a direct result of their participation in the transaction. The evidence establishes that the Trust Company of Georgia, under the agreement forming the Bankers Syndicate, was obligated to the extent of $4,500,000. The directors of the Trust Company were of the opinion that the financial strength of the Trust Company did not warrant it in assuming the obligation of $4,500,000, and they therefore authorized the Trust Company's participation in the syndicate only in the event that at least one-half of its obligation thereunder would be assumed by others. The stockholders of the Trust Company were given an opportunity to come into the enterprise and many of them, but not all, accepted. With the exception of Woodruff, they were permitted to participate according to their holdings in the Trust Company, that is, for each share of stock they owned in the Trust Company they were permitted to put $195 into the financing of the Coca-Cola Company of Delaware. Woodruff, however, in addition to investing in the enterprise $195 for each share of stock owned by him in the Trust Company of Georgia, assumed an additional obligation of several hundred thousand dollars. Some of the stockholders of the Trust Company declined to participate in the transaction and they received nothing therefrom. While it is obviously true that the taxpayers were given the opportunity to engage in the transaction because they were stockholders of the Trust Company, it is equally true, we think,

that they shared in the profits of the transaction not as stockholders receiving a dividend, but because they participated in and contributed money to the transaction. We think the evidence presented here clearly establishes that the taxpayers were joint venturers with the Trust Company of Georgia, and that they shared in the profits due to the Trust Company under the original syndicate agreement to the extent and in the proportion that they assumed and shared the liability of the Trust Company under that agreement.

The only remaining question is what profit, if any, was realized by the taxpayers as a result of their participation in the organization of the Coca-Cola Company of Delaware. The taxpayers contend that the Bankers Syndicate in reality purchased the entire issue of 500,000 shares of the common stock of the Coca-Cola Company of Delaware for $15,010,000, paying $35 per share for 417,000 shares and $5 per share for 83,000 shares; that the 417,000 shares were sold by the Bankers Syndicate to the Common Stock Syndicate for $35 per share, no profit thereon being realized by the Bankers Syndicate; that at the conclusion of the transaction, the various members of the Bankers Syndicate simply retained the 83,000 shares of stock for which they had paid $5 per share and that only upon the sale thereof could there be any profit or loss.

We are unable wholly to agree with the taxpayers' contention. We are of the opinion, however, that the Bankers Syndicate was in reality the purchaser of all of the common stock of the Coca-Cola Company of Delaware. At the time of the several steps in the stock selling campaign, outlined in the findings of fact, the Coca-Cola Company of Delaware was not in existence but, under the terms of the original syndicate agreement, was later to be brought into existence by the Bankers Syndicate, which had obligated itself to the extent of $15,000,000 for the organization and financing of the new corporation. The Bankers Syndicate was in fact at that time the corporation and in its dealings with the corporation in regard to the issues of stock was in reality dealing with itself. It could arrange the sale and set the price to suit itself. However, for the purpose of determining its profit therefrom we are unable to hold that it could properly fix a price of $35 per share for part of the common stock and $5 per share for the remainder thereof.

All of the shares of common stock were of the same issue and each share had the same actual value. The effect of the arbitrary fixing of the price of $35 per share for 417,000 shares was that it enabled the syndicate to make a sale of the 417,000 shares at more than their real cost, yet without any apparent profit, and to retain the remaining 83,000 shares at their apparent cost of $5 per share, which was in fact much less than their real cost.

In our opinion, the whole transaction involved in this appeal may be resolved into this: the Bankers Syndicate obligated itself to form the Coca-Cola Company of Delaware and to put up $15,000,000, in consideration of which it was to acquire the entire issue of common stock, the cost to it of such common stock being $30 per share. Four hundred and seventeen thousand shares of the common stock were sold by the Bankers Syndicate to the Common Stock Syndicate for $35 per share, which in turn sold it to the public for $40 per share. The Bankers Syndicate therefore realized a profit of $5 per share on the 417,000 shares and retained 83,000 shares for which it had actually paid $30 per share but for which it fixed an apparent price of $5 per share. The profits realized by the Bankers Syndicate from the sale of 417,000 shares together with the 83,000 shares retained by it were distributed among its members. The taxpayers herein, for each $195 invested by them in the enterprise, received on the completion thereof $190 and a share of stock which cost them $30. In other words, for each $195 they invested, they realized a cash profit of $25. The so-called $5 shares of stock received by them in fact cost them $30 per share and on the sale thereof a gain or loss would be realized or sustained, depending on whether the sale price was greater or less than $30 per share.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*

LITTLETON, MILLIKEN, PHILLIPS, and SMITH dissent.